**Talley v. McDermott**

10

*Joseph T. Bambrick,* for plaintiff.
*Lawrence Sager,* for defendant.

LASH, *J.,* August 5, 2009—This court held a custody trial on July 30 and 31, 2009. At issue is primary custody of the parties' son, Liam B. Talley McDermott, age 11. This court also reviewed defendant, Niall B. McDermott's (Father), partial custody time with the parties' three daughters. Also under review was whether counseling for the parties is appropriate and whether Liam should be permitted to resume individual counseling. We enter the following findings of fact:

## I. FINDINGS OF FACT

(1) Plaintiff, Clare T. Talley (Mother), is an adult individual who currently resides at 3813 Penns Drive, Reading, Berks County, Pennsylvania 19606.

(2) Defendant, Niall B. McDermott (Father), is an adult individual who currently resides at 80 Overlook Drive, Reading, Berks County, Pennsylvania 19606.

(3) The parties are the natural parents of five children, Rory N. Talley McDermott, born July 15, 1992, Elena M. Talley McDermott, born July 11, 1995, Liam B. Talley McDermott, born November 23, 1997, Maeve I.

Talley McDermott, born March 14, 2000, and Brigid C. Talley McDermott, born April 5, 2003.

(4) Both parties reside in the Exeter School District.

(5) The parties are husband and wife, having been married on January 9, 1989. The parties separated on or about November 16, 2007, when a temporary protection from abuse order was entered in favor of Mother and against Father, which among other things, evicted Father from the marital residence at 80 Overlook Drive, Reading, Berks County, Pennsylvania.[1]

(6) The parties have remained separated since the entry of the temporary protection from abuse order, but are not yet divorced. The divorce action is pending.[2]

(7) The parties were experiencing marital difficulties for an extended time. As a result, Mother filed a divorce action on May 23, 2007. Within the divorce was a count for confirmation of custody in which Mother requested the court grant primary custody of the five children to her. However, the parties continued to reside together.

(8) The problems came to a head on or about November 15, 2007. On that date, the minor child, Rory, was cut with a pair of scissors. The incident began after Mother observed the parties' daughter, Maeve, walking around a table with a pair of sharp scissors. Mother directed her daughter to put the scissors down, however, Rory told Maeve not to listen to Mother. After Mother tried to retrieve the scissors, Rory grabbed the blades, then Mother and Rory each pulled on the scissors, result-

---

1. Action 07-05251, I.D. no. 2.
2. Action 07-05251, I.D. no. 1.

ing in Rory getting cut. He then cursed at Mother. Father, who was in another room and heard the commotion, began attending to Rory and stated to Mother that she "was a danger to the children." This incident was the catalyst for mother proceeding to file protection from abuse petitions against Father and Rory.[3]

(9) Temporary orders were granted by this court against Father and Rory on November 16, 2007. The temporary order against Father evicted him from the marital home. The temporary order entered against Rory did not evict Rory from the home, however, Rory moved out with Father, as did the parties' other son, Liam. Father obtained a temporary arrangement to reside in a friend's residence.

(10) On or about November 30, 2007, the parties reached an agreement, whereby Mother and the three daughters would move from the marital residence, Father and the two sons would move back into the marital residence, and Mother would receive the sum of $10,000 to assist her with relocation. Both abuse petitions were withdrawn by Mother.

(11) As a result of the separation, the custody claim began being processed. A temporary order was entered by agreement on January 3, 2008, setting forth that Father would maintain primary custody of the sons, Rory and Liam, and Mother would have primary custody of the

---

3. The basis for Mother's petition against Father was an alleged incident occurring the day before, November 14, 2007. Mother accused Father of pushing her after which she would not move when he told her to do so.

14

daughters, Elena, Maeve, and Brigid.[4] No partial custody or supervision to the non-custodial parent was set forth. The parties also agreed to have the court appoint Peter H. Thomas Ph.D., to perform an independent custody evaluation.

(12) An unfortunate estrangement developed whereby the daughters and Father had no contact, while Mother and the sons had no contact. The daughters and the sons also became estranged from each other. Each party blames the other for this circumstance.

(13) In response to a petition for special relief filed by Father, the court ordered reunification counseling through Dr. Timothy Ring of Berkshire Psychiatric Associates, which was to take place prior to resuming visitation. The order provided that Dr. Ring, once he observed progress in reconciliation, would recommend visitation or partial custody with the non-custodial parent and the children from which that party was estranged.

(14) Due to costs and insurance concerns, the parties did not proceed with counseling with Dr. Ring. In lieu thereof, the court, on June 30, 2008, by agreement of the parties, appointed Robert M. Nagle Ph.D., to perform the reunification counseling. The stipulation, which the court approved, specifically provided that Dr. Nagle would first meet with Mother and the sons to attempt reunification among them prior to involving himself with Father and the daughters.

_____

4. The order of January 3, 2008 does not identify Brigid anywhere in the order. However, the parties' clear understanding was that Mother would have primary custody of Brigid, as well as the other two daughters.

(15) On August 28, 2008, the court entered a new temporary custody order reiterating that Mother would have primary custody of the daughters and Father would have primary custody of the sons, but also setting forth that the non-custodial parent "shall be permitted partial custody or visitation as directed by" Dr. Nagle. The court also removed the case from the trial list setting forth that the custody order would remain in effect for as long as necessary and could become a permanent order, but permitting either party, if a modification was deemed necessary, to make application and obtain a hearing.

(16) Dr. Nagle scheduled and attempted to have sessions with Mother and the sons. However, Dr. Nagle cut off the sessions when he determined that the level of emotion and anger among Mother and the sons precluded any progress in reunification. In lieu of continuing with the reunification process, Dr. Nagle wrote a written report. Further, he never commenced any reunification attempts among Father and the daughters.

(17) In his report, dated November 2008, Dr. Nagle expressed concerns about Father asserting influence in the form of parental alienation. He stated: "we also feel that there is no hope for reunification attempts as long as the boys are with [Father]." He also offered his belief that Father should not have visitation with his daughters and that there is a "real possibility" that Father may be relocating to his native Ireland with the sons.

(18) Recently, the estrangement has ameliorated somewhat. Currently, the parties alternate partial custody of the youngest four children, Sundays from 1 p.m. to 4 p.m. Rory, who is now 17, remains estranged from his mother and does not participate in partial custody.

(19) Prior to Dr. Nagle's involvement, Father obtained counseling for Liam with Pennsylvania Counseling Services. Tracy R. York provided the counseling which, according to Father, went well. However, Mother, who was not involved in the decision to employ counseling for Liam, objected on or about February 18, 2008. As a result of this objection, Liam was disenrolled.

(20) At all relevant times, Mother has been unemployed, having been a homemaker during the time the parties lived together. Father is self-employed in the machine sales business, with clients all over the world. This results in occasional trans-global travel.

## II. DISCUSSION

The paramount concern in a child custody proceeding is the best interests of the child. *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d 1096, 1098 (1995). A determination of what is in the best interests of a child is made on a case-by-case basis and must be premised upon consideration of all factors which legitimately have an effect upon a child's physical, intellectual, moral and spiritual well-being. *Alfred v. Braxton,* 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995).

The overriding issue in this case is the continued presence of the estrangement, how it first occurred, and whether the problem can be resolved or at least abated. Mother predominately relies on the opinions of Dr. Nagle to support her belief that her two sons are suffering from "parental alienation syndrome," which is the reason she currently has no relationship with Rory and a tenuous relationship with Liam. She blames Father, claiming that Father has succeeded in "brainwashing"

the boys. Dr. Nagle, indeed, has offered up Father as the catalyst and questions whether Liam should be permitted to continue in the primary care of Father.

Father denies these allegations. He urges that the parties and the children need to engage in a "healing process." He sets forth that the anger the boys feel for Mother came about due to the circumstances of the separation and of Mother's mistreatment of them prior to the separation. He avers that Mother has engaged in excessive discipline of the boys, on several occasions striking them with a belt. She is also verbally abusive. He also believes that Mother has orchestrated hard feelings between he and the daughters, and that therefore, it is she, not he, who has engaged in alienating the children from a parent. He also avers that Mother has a problem with alcoholism, which may contribute to mood swings and mistreatment of the children. Finally, Mother has denied access of the daughters to the paternal grandparents, who reside in Ireland but travel to the United States to visit with the family. According to Father and the paternal grandmother, this was done without any reason whatsoever.

It is apparent that the tension between the parties has escalated into a polarization between the males and the females of the family. The estrangement is real, and extremely unfortunate, described by Father as "catastrophic."

The problem could have been avoided if the parties, when they began experiencing difficulties, would have made a commitment to work together to reach appropriate resolutions. However, the parties appear to have a strong distrust for each other, probably because they

know each other so well. This court has dealt with the parties on several occasions and agrees that neither party can be taken at his or her word, that both have serious credibility issues. Accordingly, they have refused to work with each other and have instead taken actions, ostensibly to protect their own interests, but which has also caused the gap between the respective camps to widen. They either didn't consider, or were unconcerned, that their actions would result in the five children being substantially harmed.

As Dr. Nagle spoke only on the estrangement between Mother and the boys, we consider that relationship first. In making his determination, Dr. Nagle considered the statements made to him by Mother and his observations of the poor interaction between Mother and the boys when he met with them. He also reviewed Dr. Thomas' independent psychological evaluation.

We find that Dr. Nagle had insufficient information to form a conclusion that Father alienated the boys from Mother. For one, Mother is simply not a reliable source. Secondly, there are circumstances present which adequately explain the boys' anger toward Mother. We know that Rory and his Mother were having problems prior to the separation. Rory did not hesitate to be disrespectful, acting as a rebellious teenager against Mother's authority. It is apparent that Mother overreacted on occasion, both against Rory and Liam.

Secondly, the "scissors incident" likely had a huge adverse impact. For one, Rory ended up being seriously cut, ostensibly due to his own rebellious actions, but also due to Mother's inappropriate response. To make matters worse, Mother followed up this incident by filing protec-

tion from abuse petitions against Father and Rory, resulting in Father's eviction from the premises. From the boys' standpoint, this must have appeared grossly unfair, as Father had little involvement in the scissors incident and appeared to be the more reasonable of the two parties, at least on this occasion. Further, as Mother sought protection against Rory, she had to allege that she believed she was in danger of injury from Rory.

Ultimately, Father and the boys returned to the house, after an agreement between the parties was reached, but when they returned, they found that most of the furnishings and personal property of the parties had been removed. They came back to an almost bare home. Not only were general items taken, but items particularly special to Father, such as the portrait of his parents' home in Dublin and his autographed soccer jerseys, which Mother had no interest in, were also removed. The combination of these circumstances cast Mother as unfair and vindictive. In essence, it appears that the resentment harbored by the boys against Mother developed from observations and from being hurt and angry; any promptings by Father, if they occurred at all, would be merely cumulative.

For his part, Father probably did very little to ease the tensions between Mother and the boys. However, he did endeavor to place Liam in counseling, counseling that apparently was working well for Liam until Mother required that it be cut off.

Regarding Father's estrangement from the daughters, little evidence was presented. As stated, Dr. Nagle did not investigate this issue, as he had ended the reunification efforts before reaching this issue. However, Dr.

Nagle did note that Mother admitted that, when she perceived problems between her and the boys, she issued orders to the daughters precluding them from speaking to the boys without getting her permission first. This was an improper directive, and at the very least, did nothing to promote reconciliation among the five children.

With all that being said, this court does not want to convey the impression that Mother is solely responsible for the estrangement issue or the other difficulties being experienced by the children. For example, Mother's alcohol problem may be overblown, as there was no evidence of any problems or incidents involving the children stemming from her consumption of alcohol. Further, Father's involvement with alcohol may be as substantial as Mother's. Further, while there is no direct evidence fully explaining why Father and the daughters are estranged, we find it highly unlikely that three girls would not want continuing contact with their father if there had never been any problems between Father and the daughters when they resided together. Our statements are merely contextual, as the bulk of the trial focused on Mother's relationship to the boys, primary custody of Liam being the leading issue. We recognize that both parents have left their imprint on their children, an imprint that could adversely affect them for some time to come, unless the parties make a strong effort to change their ways and work together, and unless counseling is appropriately engaged and utilized.

Certainly, counseling must occur. The order will provide that the parties will engage in co-parenting counseling and therapy sufficient to help them work together to have, as Father puts it, a "healing" episode. Secondly,

Liam shall resume counseling with Tracy R. York for, by all accounts, it was beneficial, and Mother's objections appear to be based solely on her being excluded from the decision to retain Ms. York in the first place.

Custody of Liam shall continue with Father. Father and Liam have an excellent relationship, as does Liam and his brother, Rory. There is no reason to disturb this. On the other hand, it would be best if Liam could spend some additional time with Mother, by expanding the Sunday visits. Both Liam and Mother appear to want to have a relationship with each other. Liam also wants to have a relationship with his sisters. If Mother is willing to treat Liam in a fair manner as she apparently treats her daughters, there is no reason why the relationship cannot be reestablished and begin to blossom. By all accounts, Mother is an excellent cook, so it would appear appropriate that Mother prepare a nice meal for herself, her daughters and Liam on Sundays before he returns to his Father. Sitting together at the dinner table, discussing events of the day in a positive manner, could be therapeutic.

Likewise, Father should have some additional time with the daughters. We will also expand Father's time with the daughters, commensurate with the expansion of Liam's time with Mother. Finally, as Mother herself testified that there were no issues with the paternal grandparents, they shall be permitted liberal access to all the children when they are visiting from Ireland. We enter the following order:

## ORDER

And now, August 5, 2009, after trial held, this court orders that custody of the parties' minor children, Rory

N. Talley McDermott, born July 15, 1992, Elena M. Talley McDermott, born July 11, 1995, Liam B. Talley McDermott, born November 23, 1997, Maeve I. Talley McDermott, born March 14, 2000, and Brigid C. Talley McDermott, born April 5, 2003, (minor children), shall be as follows:

(1) The parties shall share legal custody of the minor children.

(2) Defendant, Niall B. McDermott (Father), shall have primary physical custody of Rory and Liam.

(3) Plaintiff, Clare T. Talley (Mother), shall have primary custody of Elena, Maeve and Brigid.

(4) The parties shall alternate custody of Liam, Elena, Maeve and Brigid on Sundays from 1 p.m. to 7 p.m., such that the four minor children shall be together every Sunday.

(5) By agreement, the minor child, Rory, shall not be required to spend time with his mother. However, if he elects to visit with his mother, he shall be free to do so.

(6) counseling for Liam shall be reestablished with Tracy R. York of Pennsylvania Counseling Services. The costs for this shall be borne by Father.

(7) The parties shall engage in co-parenting counseling, therapy, and such other counseling as deemed recommended by the counselor. The counselor shall be appointed by agreement of the parties or, in lieu thereof, by the court. The parties shall share the costs equally, however, selection of the counselor shall be conditioned, if at all possible, upon the counselor accepting the parties' insurance coverage.

(8) When the paternal grandparents are visiting the United States from Ireland, all five minor children shall be permitted liberal access to them during the grandparents' stay. If the parties cannot agree on a schedule, either party may make informal application to the court.

(9) Mother shall be entitled to custody of the four minor children on Mother's Day and Father on Father's Day each year from 1 p.m. to 7 p.m.

(10) The parties shall alternate the Christmas vacation, such that Father shall have custody from December 24 at 1 p.m. to December 25 at 1 p.m. and Mother shall have December 25 at 1 p.m. to December 26 at 1 p.m. on even-numbered years, with the parties to reverse the schedule on odd years.

(11) Each party shall be entitled to one week vacation time with the four minor children. The vacationing party shall provide the non-vacationing party with at least 60 days written notice of the dates and times for said vacation.

(12) The holiday and vacation schedules shall take precedence over the regular custody schedule.

(13) The attached appendix shall be made a part of the within order.

---

## APPENDIX TO ORDER

Certain rules of conduct which generally apply to custody matters are set forth below and are binding on both parties, the breach of which could become the subject of contempt proceedings before this court, or could

24

constitute grounds for modification of this order. If these general rules conflict with any specific provisions of the order, the order shall prevail.

(1) In addition to the foregoing rights, both parties shall also have the following rights with respect to the children:

(A) The right to reasonable telephone contact with the children when they are in the other parent's custody.

(B) The right to be fully informed concerning the progress of the children in school and the children's medical status, including the right to obtain the necessary information directly from the children's school or medical practitioner; and

(C) The right to be informed in advance before any important decisions are made concerning the children and the opportunity to participate in those decisions.

(2) In the event of any serious illness of the children at any time, any party then having custody of the children shall immediately communicate with the other party by telephone or by any other means, informing the other party as to the nature of such illness, and during such illness, each party shall have the right to visit the children as he or she desires consistent with the proper medical care of the children.

(3) Neither party shall alienate nor permit to attempt to alienate the children from the other party. While in the presence of the children, neither parent shall make any remarks or do anything which is derogatory or uncomplimentary to the other and it shall be the duty of each parent to uphold the other parent as one the children should respect and love.

(4) Both parties shall provide each other with their addresses and telephone numbers of their residences and anytime they take a trip with the children out of the jurisdiction of Berks County in excess of three days.

(5) The parties shall not conduct arguments or heated conversation when they are together in the presence of their children.

(6) The parties shall, at all times, consider the children's best interests, and act accordingly. It is in a child's best interest to understand that he or she is trying to desperately cope with the fact of his or her parents' separation, and needs help in loving both parents, rather than interference or censure.

(7) Neither party shall question the children as to the personal lives of the other parent except insofar as necessary to insure the personal safety of the children. By this we mean that the children will not be used as spies on the other party. It is harmful to a child to be put in the role of spy.

(8) The parties should remember that they cannot teach their children proper moral conduct by indulging in improper conduct themselves. Children are quick to recognize hypocrisy, and the parent who maintains a double standard will lose the respect of his or her child.

(9) Weekend and evening visitation shall be subject to:

(A) Arrangements will be worked out beforehand between the parties without forcing the children to make choices and run the risk of parental displeasure. However, the children shall be consulted as to their schedules when appropriate.

(B) Visitation rights shall be exercised at reasonable hours and under circumstances reasonably acceptable to the other party and to the need and desire of the minor children.

(C) If a party finds himself or herself unable to keep an appointment, he or she should give immediate notice to the other party, so as to avoid subjecting the children to unnecessary apprehension and failure of expectations.

(D) The party having custody of the children should prepare them both physically and mentally for the transfer of custody to the other party and have them available at the time and place mutually agreed upon.

(E) If either party or a child has plans which conflict with a scheduled visit and wish to change such visitation, the parties should make arrangements for an adjustment acceptable to the schedules of everyone involved. Predetermined schedules are not written in stone, and both parties should be flexible for the sake of the children.

(F) If a party shows up for a visit under the influence of alcohol or drugs, the visit may be considered forfeited on those grounds alone.

(10) If either party feels the other party has violated this order, they may petition the court as set forth in Pa. R.C.P. 1915.12.